102 So.2d 446

Maurice D. SHANNON, Jr., Edward J.
Patterson & Paul DeChary,

v.

MORGAN CITY HARBOR & TERMINAL
DISTRICT.

No. 43503.

April 21, 1958.

Rehearing Denied May 26, 1958.

Faris, Leake & Emmett, New Orleans, for appellants.

J. Y. Gilmore, Sr., Leonard C. Wise, Morgan City, for appellee.

FOURNET, Chief Justice.

The plaintiffs, taxpayers of St. Mary Parish residing within the boundaries of the Morgan City Harbor & Terminal District, are appealing from a judgment dismissing on the merits their suit (1) to have declared unconstitutional Act 530 of 1952, as amended by Act 428 of 1956 (RS 34:321–332), creating the District as a political subdivision of the state; (2) to have annulled any and all proceedings of the District pursuant to a resolution adopted by its governing authority on February 25, 1957, wherein it proposed to issue and sell bonds totalling $200,000 for acquiring, constructing, and improving port facilities, such bonds being secured by mortgage on the property and equipment under its jurisdiction, and payable by pledge of revenues derived from the operation of these facilities or otherwise legally appropriated and secured; and (3) permanently enjoining the District from incurring debt of any kind or issuing any notes or bonds under the provisions of Act 530 of 1952, as amended.

Although in the petition the sufficiency of the resolution of February 25, 1957, in designating the property securing the proposed indebtedness is challenged,[1] and its constitutionality is assailed for failure to secure the approval of the Board of Commerce and Industry under the provisions of Section 14(b.2) of Article XIV of the Louisiana constitution, the allegations are levelled primarily at the constitutionality of the 1956 amendment to the creating act. These attacks may be summarized as follows:

(1) The authority given the District to regulate fees and charges made by private owners for their dock facilities constitutes a deprivation of property without the due process of law guaranteed in both the federal and state constitutions.[2]

(2) The broad and exclusive powers conferred upon the district represent a substantial burden on interstate commerce, in violation of Paragraph 3 of Section 8 of Article I of the Constitution of the United States.[3]

(3) Section 9 of the act as amended (RS 34:329) is violative of Section 10 of Article X of the Constitution of Louisiana in that it (a) provides for taxation for purposes other than acquiring title to property, (b) fails to impose a ten-year limitation on this tax; (c) authorizes the governing board to impose ad valorem taxes without an election; and (d) authorizes the imposition of a 2½ mill ad valorem tax without regard to existing taxes on the property within the District, in violation of the 25 mill limitation.[4]

(4) Section 10 of the act as amended (RS 34:330) violates several provisions of Section 14 of Article XIV of the Louisiana constitution in that it (a) permits the issuance of negotiable bonds without an election, contrary to Section 14(a) and (b.2) and also RS 33:4221–4262; (b) fails to provide for a special tax sufficient to pay the

1. This has apparently been abandoned. In any event, it is without merit, for the full faith and credit of the District is specifically pledged and all properties under its jurisdiction are mortgaged.

2. RS 34:323 provides in this respect that the District "may regulate reasonably the fees and charges made by privately owned wharves, docks, warehouses, elevators, and other facilities within the limits of the district when the same are offered for the use of the public."

3. RS 34:323 on this point provides that "The said board shall have the power to regulate the commerce and traffic of

said harbor and terminal district in such manner as may in its judgment be best for the public interest." This contention has apparently been abandoned since it is not argued in this court.

4. The portion of this section objected to was not amended in 1956 and provides: "The board may, when necessary, levy annually an ad valorem tax not to exceed two and one-half mills on the dollar on the property subject to taxation situated in the district. All funds derived under this Section shall be used to defray the administrative, operative and maintenance expenses of the board."

principal and interest on the bonds or a sinking fund for their retirement, in violation of Section 14(a); (c) fails to limit the permissible bonded indebtedness of the District to 10% of the assessed valuation of the taxable property, in violation of Section 14(f); and (d) authorizes the issuance of bonds that are not intended to raise money to construct, acquire, extend, or improve any revenue producing public utility, in violation of Section 14(m).

In amending the constitution of 1921 by adding Section 31 to Article XIV, the people empowered the legislature to create as state political subdivisions port, harbor, and terminal districts and to provide for their organization, government, duties and powers. Pursuant to this authorization the legislature in 1952 by Act 530, created the Morgan City Harbor and Terminal District, designating its governing authority and specifying their duties and powers.[5] Among these was the power to (a) borrow from anyone using the port facilities for the purpose of constructing improvements, such indebtedness to be liquidated out of the fees charged; (b) issue bonds upon authorization of the taxpayers of the district at a duly called election; and (c) levy

ad valorem taxes to defray administrative and operative expenses, in the manner provided for the levy, assessment, and collection of other state and parish taxes. By Act 630 of 1956 the legislature proposed an amendment to Section 31 of Article XIV which, as subsequently ratified, greatly enlarged the duties and powers of these port, harbor, and terminal districts, many of which are not pertinent here. Act 428 of the same year was adopted as the enabling act to carry out these enlarged purposes in so far as the defendant District is concerned, its effectiveness and operation dependent, of course, upon the approval of the amendment by the people.

Under the enlarged powers accorded by the 1956 constitutional amendment, these port, harbor, and terminal districts are authorized—in addition to borrowing funds from those using the facilities and issuing bonds for the needs of these subdivisions in the manner provided by the constitution and laws of the state, "including, but not by way of limitation, Article XIV, Section 14, paragraph (b.2)"[6]—"to issue negotiable bonds for any purpose within the authority delegated them, and to pledge for the payment of the principal and interest of

5. These were enlarged by Act 325 of 1956, but the provisions of this act are not questioned in this proceeding, or pertinent to the issues here raised.

6. This provision authorizes issuance of bonds for the purpose of acquiring plant sites for sale or lease under a state-wide program of encouraging industrial enterprises to locate in the state. These bonds are issuable only following a duly called and held election at which they are approved by the people in the locality concerned.

such negotiable bonds the income and revenues derived or to be derived from the properties and facilities maintained and operated by them," and also to "further secure their payment by a conventional mortgage upon any or all of the properties constructed or acquired, or to be constructed and acquired by them."

The procedure to be followed in using such bonds was set out in detail in the constitutional amendment and is to the effect that they "shall be authorized by a resolution of the governing authority of the district," "with the approval of the State Bond and Tax Board," signed by the district's officers, etc. They were given all the qualities of negotiable instruments and any revenue producing facility acquired by the proceeds of such bond issues was "declared to be a revenue producing public utility as that term is used and defined by the Constitution and laws of the state in connection with the issuance of revenue bonds of political subdivisions of the state." Act 428, enlarging the powers of the defendant District, tracks these constitutional provisions.

From the summary of the allegations of the petition as given above, it is obvious the plaintiffs are not here contending the procedure set out in the constitutional amendment and its enabling act for the issuance of bonds under resolution of the governing authority of the District have not been strictly followed. Instead, the challenge to the legality of the bonds is grounded primarily on the unconstitutionality of the creating act of 1952 as amended in 1956 in that the provisions of Section 9 of the act contravene Section 10 of Article X of the constitution, and Section 10 is violative of Paragraphs (a), (b.2), (f), and (m) of Section 14 of Article XIV.

■ In view of the specific provisions of Section 31 of Article XIV as amended in 1956, which specifically authorizes the issuance of bonds by port, harbor, and terminal districts pursuant to a resolution of the governing authority with the approval of the State Bond and Tax Board, it is clear that the constitutional provisions relied on by the plaintiffs are inapplicable. Section 10 of Article X of the constitution authorizes the assessment of special local taxes for public works and schools, pursuant to the authorization of the local taxpayers at a duly held election. Ports, harbors, and terminals are not mentioned among the public works there specifically listed. Section 14 of Article XIV of the constitution authorizes the issuance of bonds by municipal corporations, parishes, and other sub-disivions of the state, but not including ports, harbors, and terminals, when authorized by a majority of the property taxpayers in the area involved at a duly called election.

■ Since no election is being called in the instant case and no tax is being lev-

ied, the sinking fund and special tax levy called for in Section 14(a), the limitation on the permissible bonded indebtedness under Section 14(f), and the provisions of RS 33:4221–4262, all dealing with matters pertaining to the issuance of bonds authorized at such an election, can have no bearing on the legality of bonds issued here pursuant to a resolution of the governing authority of the District with the approval of the named state board under the provisions of Section 31. Section 14(b.2) deals specifically with bonds duly authorized by property taxpayers, the proceeds of which are to be used for sites to sell or lease to new industries. It was not necessary, therefore, to secure the approval of both the State Bond and Tax Board and the Board of Commerce and Industry as required in this section, particularly since Section 31 requires the approval of the former only. Furthermore, inasmuch as Section 31 specifically classifies the property acquired with these bonds as revenue producing public utilities within the meaning and intendment of the constitution and laws of this state, the allegations that the resolution and Section 10 of Act 530 are unconstitutional in that the "bonds to be issued thereunder are not for the purpose of constructing, acquiring, extending or improving any revenue producing public utility," is untenable.

In brief counsel further contend that inasmuch as it is provided in Section 2 of Act 428 of 1956, amending Act 530 of 1952 (RS 34:330), the board is authorized to incur debt and issue *tax* secured bonds "in the manner and subject to the requirements of Article XIV, Section 14, paragraph (b.2) of the Constitution," and this provision requires a vote of a majority in number and property taxpayers as a prerequisite to the issuance of such bonds, the issue here contemplated is illegal.

There is no such provision in Section 31 of Article XIV as approved in 1956. Furthermore, this provision in the 1956 act has reference to bonds authorized at a duly called election which are to be retired from tax levies. The paragraph following this provision specifically provides, as authorized in the 1956 constitutional amendment, that the authority to issue bonds payable out of revenues and secured by mortgage on all district property as authorized by resolution of the governing board, is "In addition to the above power to issue bonds and without reference to any other provisions of the Constitution or statutes of the state."

This leaves for our consideration the contention that the creating act of 1952 as amended is unconstitutional in that it authorizes the governing authority to regulate fees and charges made by private owners for their dock facilities. It is argued this constitutes a deprivation of property without due process of law inasmuch as no

standards are laid down for determining the reasonableness of such fees.

 While it is true that standards are required in legislation to guard against arbitrary and capricious action by a governing authority under penalty of unconstitutionality (McCauley v. Albert E. Briede & Son, 231 La. 36, 90 So.2d 78; and the authorities therein cited), the provision cannot have the effect of invalidating this bond issue as it has no bearing on the procedure to be followed leading up to the issuance of the bonds. Such a provision is, furthermore, open to attack only by those private owners who might be adversely affected by arbitrary action and then only when it can be shown the enforcement of such regulations would infringe their rights. See McCauley v. Albert E. Briede & Sons, supra, and In re Board of Commissioners of the St. Charles Parish Hospital Service District, 232 La. 889, 95 So.2d 488. In any event, the act contains a severability clause: consequently, should the provision be declared unconstitutional for any reason, the remaining provisions of the act would not fall. Succession of Dyer, 184 La. 251, 166 So. 68; Airey v. Tugwell, 197 La. 982, 3 So.2d 99; Stewart v. Stanley, 199 La. 146, 5 So. 2d 531; State v. Baggott, 212 La. 795, 33 So.2d 523; State ex rel. Kemp v. City of Baton Rouge, 215 La. 315, 40 So.2d 477.

For the reasons assigned, the judgment appealed from is affirmed.